IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) |
| CARNELL ROBERTS | ) C.A. No. 20-cr-66 (MN) |
| | ) |
| Defendant. | ) |

**MEMORANDUM ORDER**

At Wilmington, this 6th day of May 2022;

On October 1, 2021, Defendant Carnell Roberts ("Defendant" or "Roberts") submitted a Motion to Suppress Evidence. (D.I. 30). The Government responded on October 20, 2021. (D.I. 31). On March 2, 2022, the Court conducted an evidentiary hearing regarding the issues raised. (D.I. 38). After the hearing, the parties submitted additional briefs. (D.I. 39, 40, 41). The Court has reviewed all the filings, the evidence submitted, and the arguments presented. For the reasons set forth in this opinion, Defendant's Motion to Suppress is DENIED.

**I.    FINDINGS OF FACT**

At the evidentiary hearing held on March 2, 2022, the government called one witness, Officer Daniel Collins ("Collins"), and the Defendant called one witness, Erin Roosevelt ("Roosevelt"), an assistant manager of Cabela's, an outdoor recreation-oriented retail store. The Court found both witnesses to be credible. The following represents the Court's essential findings of fact as required by Rule 12(d) of the Federal Rules of Criminal Procedure.

1.      Officer Collins is a probation officer who has been employed by the Delaware Department of Corrections for sixteen years. (Tr. 3:7–12).[1] For roughly eleven years, Officer

---

[1]     The Transcript referred to here and throughout this opinion may be found at D.I. 38.

1

Collins has been assigned to Operation Safe Streets Task Force, a joint task force that involves traditional police methods of patrol as well as monitoring probationers. (Tr. 3:13–21).

2. In July 2020, Collins conducted a motor vehicle stop and found cocaine in the driver's vehicle. (Tr. 4:2–8). Collins placed that individual under arrest, took him back to the police station, and told him that the state would not proceed with charges if he agreed to provide information to the state. (Tr. 4:18–5:17). The individual was on probation, but Collins did not know of and had no prior interactions with him. (Tr. 5:18–20; 30:14–20). The individual accepted Collins's offer and agreed to become a confidential informant ("CI") to help himself out.

3. At the police station, the CI provided the officers with information about two individuals. First, the CI relayed information about an individual who is not the defendant in this case who "was always coming in the area with a gun and shooting people . . . and causing a ruckus." (Tr. 6:7–14). Though the CI did not know the individual's name, he knew his nickname and the area he frequented. Collins entered that information in a nickname database, found a hit, and conducted a photo array to determine whether the CI was able to identify the individual whose nickname was a hit in the database. (Tr. 6:14–17). The CI correctly identified the individual and the individual had several warrants out for his arrest. (Tr. 6:17–20).

4. Later that day, the CI saw the individual in question in the CI's neighborhood and called Collins to alert him about the individual's presence. This prompted Collins and other officers to go to the area to arrest the individual for his outstanding warrants. (Tr. 7:4–17). After a foot chase, officers arrested the individual and his friend, each of whom possessed firearms. (Tr. 7:17–21). Both individuals ended up either pleading or being convicted of a firearm violation in Superior Court or Family Court. (Tr. 7:22–25).

5.      The second piece of information provided by the CI concerned Defendant Roberts. As with the first individual, the CI did not know Roberts' name, and instead reported that he had seen an individual who was living in the 800 block of West 7th Street, who wore an ankle monitor and was on probation, carrying a firearm several times. (Tr. 8:8–17).

6.      Collins used the probation system to search for probationers living on 7th Street and found Defendant, a Level 2 probationer who wore an ankle monitor. (Tr. 8:18–9:4). Collins then produced a photo array comprising four or five pictures and showed it to the CI to see if he could identify Roberts. The CI positively identified the Defendant. (Tr. 9:5–11, 9:18–25). Days later, Collins called the CI again to "reconfirm" what the CI had first reported, and the CI's report about Roberts remained consistent. (Tr. 10:8–22).

7.      At the relevant time, Roberts was on probation. (Gov't Exhibit 1). As a condition of his probation, Roberts consented to and understood that he is subject to a search of his living quarters, property, person, personal effects, and vehicle without a warrant at any time by a probation officer. (*See id.*). In addition, Roberts agreed to not possess or consume any non-prescribed controlled substance or dangerous drug, and to not own, possess, or be in control of any firearm or deadly weapon without the written approval of his supervising officer. (*See id.*).

8.      After receiving the information from the CI, Collins began investigating Roberts. Collins surveilled Roberts' residence several times by driving by it in an unmarked, but recognizable police vehicle. When Collins drove by Roberts' house, he noticed that people on the street would quickly rush into Roberts' unlocked house. (Tr. 11:18–12:5). In Collins' experience, people entering unlocked doors to avoid police detection indicates nefarious behavior. (Tr. 12:6–8; 14:5–15). Collins observed this behavior several times over two or three days, but never stopped, searched, or spoke to any of the individuals he saw outside of Roberts' house. (Tr. 36:6–

11). Collins also knew the area to be a high-crime area and that Roberts had several felony convictions for drug-related and sex offenses. (Tr. 15:4–19).

9. In addition, Collins used GPS monitoring of Roberts' ankle bracelet to track his location and observed that Roberts was very recently at a Cabela's, a store that sells firearms and ammunition along with many other innocuous items, for forty-five minutes. (Tr. 15:23–16:9). Roberts' time at Cabela's "was a red flag" to Collins because the CI reported that Roberts, a felon, was carrying a gun, in addition to "everything else that [he] had witnessed." (Tr. 16:9–10).[2] Roberts did not attempt to obtain video surveillance from inside Cabela's to see what Roberts was doing inside the store. (Tr. 38:16–39:3).

10. On August 3, 2020, Collins contacted his supervisor, Supervisor Carlo Pini, to obtain an administrative search warrant according to departmental procedure. (Tr. 16:15–21; 17:5–8). Collins indicated that he "had a past proven reliable informant giving [him] information about a [probationer] that may have a possession of a firearm, and the informant identified him by picture, by his residence, by the fact that he was on a GPS monitor." Collins further reported that he had conducted "drive-bys of the residence [and about] how people were in and out of the residence several times." Collins also indicated that "the GPS put [Roberts] inside a gun store a couple of days prior for an extended period of time." (Tr. 17:18–18:2). Collins and Pini filled out a verbal checklist to indicate the reasons that Collins wished to search Roberts' residence. (Tr. 17:9–17). On that checklist, Collins indicated that the offender is believed to possess

---

[2] The Court credits the testimony of Ms. Roosevelt that the Cabela's store is "an outdoor sporting store" and not one that she would describe as primarily a gun store. (Tr. at 61). There is no dispute, however, that Cabella's does sell guns in addition to other merchandise.

4

contraband and that information from an informant is corroborated. (Government Exhibit 2). Pini gave Collins permission to search Roberts' residence. (Tr. 18:3–5).

11. Several hours after obtaining oral approval from his supervisor, Collins and several other officers went to search Roberts' residence. (Tr. 22:11–20; 23:5–10). The officers waited until Roberts arrived, and when he did, they detained him and entered the house before explaining that they were going to perform an administrative search to look for firearms or illegal narcotics in his residence. (Tr. 23:11–24:6).

12. After Collins explained the reason for his visit, Roberts admitted that he had a .22 caliber firearm under a mattress. (Tr. 27:6–16). Collins then retrieved the firearm. (Tr. 27:23–28:7). In the house, Collins also observed, in plain view, a white substance (that later tested positive for cocaine) in a bag that was tied in a manner consistent with how Collins had seen other bagged drugs packaged. (Tr. 25:17–26:23). Further, upon entering the residence, Collins noticed a strong odor of marijuana, and though he could not tell if he was smelling fresh or burnt marijuana, officers discovered several pounds of marijuana in the residence. (Tr. 24:7–25:2; 28:11–13; 46:21–47:8). In addition to the marijuana, cocaine, and firearms, the officers found ecstasy pills, scales, baggies, a magazine for a .40 caliber firearm, a box of 9-millimeter ammunition, $3,000 in suspected gun proceeds, and a safe. (Tr. 28:8–21).

## II.  LEGAL STANDARD

The Fourth Amendment to the United States Constitution protects "the right of the people to be secure against unreasonable searches and seizures . . . ." U.S. CONST. amend IV. When a search is conducted without a warrant, the government must demonstrate that the search was conducted pursuant to one of the exceptions to the warrant requirement. *See United States. v. Herrold*, 962 F.2d 1131, 1137 (3d Cir. 1992). Evidence obtained in an unconstitutional manner

will usually be suppressed as "fruit of the poisonous tree." *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006) (citing *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963)).

Probation officers may search a probationer's residence based on reasonable suspicion that the probationer is engaged in criminal activity therein. *United States v. Knights*, 534 U.S. 112, 122 (2001). Reasonable suspicion requires that "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez,* 449 U.S. 411, 417–18 (1981). The reasonable suspicion standard demands less than probable cause but more than an inarticulable hunch. *See Terry v. Ohio*, 392 U.S. 1, 27 (1967).

In determining whether officers had reasonable suspicion, courts must review the totality of the circumstances. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Further, the reasonable suspicion inquiry is to be considered from the vantage point of a "reasonable, trained officer standing in [the detaining officer's] shoes." *Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2003). The question that must be posed is whether "the facts available to the officer at the moment of the seizure or search warrant a man of reasonable caution in the belief that the action taken was appropriate." *Terry*, 392 U.S. at 21–22 (internal quotations and citations omitted).

### III. DISCUSSION

Roberts moved to suppress the physical evidence seized from his residence on or about August 3, 2021 on the grounds that the search and seizure was unlawful and in violation of his rights under the Fourth Amendment of the United States Constitution. (D.I. 30). Roberts argues that the state lacked the necessary reasonable, articulable suspicion of criminal activity which would justify an administrative search of his residence, and therefore whatever found in his residence must be suppressed. (*See* D.I. 39, 41). He contends that there was no reasonable suspicion because the tipster was not sufficiently reliable and the government failed to corroborate

crucial aspects of the tip.  Specifically, Roberts argues that the fact that the CI was "a recently detained criminal suspect who believed that he could receive leniency from prosecution if he provided information implicating someone else in criminal activity . . . undermined the informant's credibility."  (D.I. 41 at 2).  Moreover, Roberts contends that the tip itself "lacked sufficient 'indicia of reliability' as 'it provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility.'"  (*Id.* (quoting *Florida v. J.L.*, 529 U.S. 266, 271 (2000)).  The government justifies the search by claiming that it possessed the requisite level of suspicion because it possessed a tip from a known, reliable informant and independently corroborated certain aspects of that tip.  (See D.I. 40).

To determine whether a tip is reliable, the Court considers whether: (1) the information was provided to the police in a face-to-face interaction, allowing an officer to assess directly the informant's credibility; (2) the informant can be held responsible if his allegations are untrue; (3) the information would not be available to the ordinary observer; (4) the informant has recently witnessed the criminal activity at issue; and (5) the witness's information accurately predicts future activity.  *See United States v. Johnson*, 592 F.3d 442, 449 (3d Cir. 2010).  Because the reasonable suspicion inquiry analyzes the totality of the circumstances, no single factor is dispositive or necessary to render an informant's tip reliable.  *See id.*  Here, the totality of the circumstances suggest that the CI's tip was reliable.

First, Collins received information about Roberts in a face-to-face interaction which allowed him to gauge the CI's credibility.  Although the specific length of the interaction was not stated, the interaction involved gathering information about another suspect in addition to about Roberts, and conducting a photo array to see if the CI could positively identify both individuals that the CI had provided information about.  During Collins' in-person discussion with the CI,

Collins had ample time to ascertain the informant's reliability, and Collins deemed him to be reliable.

Further, the CI both had a strong incentive to provide truthful information and also could have been held legally responsible if his allegations proved untrue. After the CI was found with cocaine, he was told that if he provided information about others, the state would not proceed with charges, but charges would issue if he did not help. Therefore, the CI had an incentive to provide the state with accurate information. *See United States v. Dennington*, No. 1:07-cr-43-SJM-1, 2009 WL 2591763, at *7 (W.D. Pa. Aug. 21, 2009) (noting that informant who "provided the relevant information during the pendency of his own criminal prosecution when he was in federal custody [] had every motivation to be helpful to law enforcement agents in order to obtain the best sentence possible."). Indeed, if the CI's reports were false, the CI would be exposed to criminal liability. *See* 11 Del. C. § 1245(3); *U.S. v. Bland*, No. 08–37–JJF, 2008 WL 4450240, at *5 (D. Del. Sept. 30, 2008) (observing that a known tipster's report was more likely to be reliable because the tipster could be held criminally liable under 11 Del. C. § 1245(3) if his report was false). This factor weighs in favor of the CI's reliability.

Third, at least some of the information provided by the CI is not likely to be available to the ordinary observer. As explained above, the CI told Collins that an individual (later identified to be Roberts) was living on a particular block, wore an ankle monitor, was on probation, and had been seeing carrying a firearm to and from his residence several times. It appears to be undisputed that the information conveyed about the firearm was not available to an ordinary observer. It is not, however, obvious that the information about the ankle monitor and probation would not be available to the ordinary observer, since this could be gleaned simply by observing Roberts wearing shorts and sandals. Nevertheless, because at least some information that Roberts provided

8

would not be available to an ordinary observer, this factor provides some additional support in favor of the tip's reliability.

Factors four and five do not provide much, if anything, to bolster the tip's reliability. For factor four, although the CI reported seeing Roberts carrying a firearm, there is no indication in the record when he saw Roberts with a firearm. Factor five is also of little import in this case, as none of the information Roberts relayed was predictive of future activity. Nevertheless, viewing these factors together, because the CI had a strong incentive to provide accurate information, provided information that would not be available to an ordinary observer, and was deemed to be credible by an experienced officer who interacted with him face-to-face for an extended period of time, a reasonable officer would view the CI's tip as being reliable.

Moreover, after receiving the CI's initial tip about Roberts, two events occurred to bolster the tip's reliability in the opinion of a reasonable officer. First, not only did the government know that the CI's other tip resulted in an arrest of two individuals who at the time were carrying firearms, but the government also knew that the CI was instrumental in effectuating that arrest. Therefore, at the time that officers performed their administrative search of Roberts' residence, the CI's reliability had been past proven. *See United States v. Cephas*, 808 F. App'x 122, 124 (3d Cir. 2020) (in concluding that the tip was reliable, noting that the "tipster had provided credible information leading to at least one arrest."); *United States v. Stearn*, 597 F.3d 540, 557 (3d Cir. 2010) (quoting *Illinois v. Gates*, 462 U.S. 213, 244 (1983)) ("[If] an informant is right about some things, he is more probably right about other facts."); *U.S. v. Marino*, 682 F.2d 449, 453 (3d Cir.1982) (internal citations omitted) ("It is not necessary, moreover, that the informant's tips have led to convictions; a prior history of tips that result in arrests and in the securing of information and evidence can provide a sufficient basis for concluding that the information is reliable").

Second, Collins was able to corroborate certain pieces of information provided by the CI and performed further investigative work that revealed indications of criminal activity. After receiving information that a probationer who wore an ankle monitor and lived on a specific block was seen carrying a firearm several times, Collins corroborated the information that a probationer wearing an ankle monitor was, in fact, living on that block. Collins conducted a photo array to ensure that the CI's report concerned Roberts, and not some other individual. Further, Collins used GPS location monitoring that indicated Roberts had recently visited a Cabela's, a store that sells firearms and ammunition (among many other goods). Last, Collins' drive-by surveillance of Roberts's residence raised "a red flag" that something suspicious was happening at Roberts's house. (Tr. 14:5–15). Although none of the tips provided by the CI were predictive in nature, "[w]here initial suspicion arises not from officer observation but from an *identifiable* informant's tip, only minimal police corroboration may be needed to justify an investigative stop. Where the informant is identified, his veracity, basis of knowledge, and track record of providing information may suggest the tip's inherent reliability." *United States v. Nelson*, 284 F.3d 472, 485 (3d Cir. 2002) (Ambro, J., dissenting) (explaining why a tip from a known informant requires less corroboration than an anonymous tip in a dissent insisting that the anonymous tip at issue was not adequately corroborated in order to provide the officers reasonable suspicion) (emphasis in original).

Ultimately, the Court finds that the officers had reasonable suspicion to conduct an administrative search of Roberts' residence.[3] At the time they searched Roberts' residence,

---

[3] The Court is not persuaded by Defendant's contention that the state's failure to abide by Delaware Department of Corrections regulations governing the granting of administrative search warrants impacts the Court's analysis. (*See* D.I. 39 at 7–8). As a preliminary matter, the Court is not persuaded that the state deviated from a regulation requiring certain pre-search procedures. *See* Delaware Department of Correction Bureau of Community

officers possessed information by a past-proven informant who discussed seeing Roberts carrying a firearm on several occasions. Several facets of the informant's tip were corroborated by independent officer investigation. Further, when officers surveilled Roberts's residence, they noticed behavior that suggested suspicious activity. Based on the totality of circumstances, the Court concludes that the state possessed the requisite reasonable, articulable suspicion to conduct an administrative search at Roberts' residence.

Once lawfully in the house to conduct an administrative search, the Court is satisfied that the government conducted its search lawfully. Once in the residence, the state had the right to search anywhere in Roberts' residence where evidence of Roberts's suspected probation violation could reasonably be found. *See United States v. Crews*, No. CR 06-418, 2009 WL 426646, at *6 (W.D. Pa. 2009) ("[Officer] was conducting a lawful search of [probationers'] residence based upon his reasonable suspicion that a probation violation had occurred. The scope of this search included anywhere in the residence where contraband or evidence of the probation violation could reasonably be found."). When Collins entered the house, he reported smelling a "very strong" scent of marijuana, which gave rise to reasonable suspicion of another probation violation – possession of marijuana. (Tr. 24:7–25: 10). *See United States v. Hutchinson*, 417 F. Supp. 2d 497, 509 (M.D. Pa. Jan. 18, 2017) (explaining that "plain smell can provide probable cause to justify a search where an officer smells a substance that is immediately apparent to him

---

Corrections Probation and Parole Procedure § 7.19. Even if the state had, however, the relevant question for a motion to suppress is not what Delaware law requires, but "what the Fourth Amendment demands of the challenged search." *United States v. Henley* 941 F.3d 646, 650 (3d Cir. 2019); *See Virginia v. Moore*, 553 U.S. 164 (2008) (finding that officers did not violate the Fourth Amendment by arresting motorist who, under state law, should not have been arrested). As explained above, the Fourth Amendment requires only reasonable suspicion to enter Defendant's residence because he is a probationer who agreed to "a search of [his] living quarters . . . without a warrant at any time by a probation/parole officer." (Government Exhibit 1). The Court finds such grounds present here.

11

to be the odor of contraband."). Further, after seating Roberts on a couch in his living room, Collins looked up and saw a knotted bag of a white substance sitting in plain view on the shelf of an open living room closet. Collins' experience informed him that the bag was tied similarly to other bags that he has encountered in drug investigations. (Tr. 25:11–26:23). And last, when Collins explained to Roberts that he was conducting an administrative search and asked whether Roberts had any firearms or drugs, Roberts confessed that there was a gun under a mattress. These events gave the state a sufficient basis to search for drugs, firearms, and ammunition, and the Court therefore concludes that the state had a sufficient basis to seize the evidence it seized.

IV. **CONCLUSION**

The state learned from a confidential informant that a probationer with an ankle monitor who lived in a particular block was seen carrying a firearm on several occasions. At the time the state obtained an administrative warrant to search Roberts' residence, officers understood the informant to be past-proven and reliable and had verified certain facets of his tip. Once lawfully in the residence, the state conducted a valid administrative search. THEREFORE, for the foregoing reasons, IT IS HEREBY ORDERED that Defendant's motion to suppress (D.I. 30) is DENIED.

*Maryellen Noreika*
The Honorable Maryellen Noreika
United States District Judge